**Ledester LUMPKIN, et al., Plaintiffs,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Defendant.**

No. 94 C 3637.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 13, 1995.

Stephen Horwitz, Jacob, Burns, Sugarman, Orlove & Stanton, for plaintiffs.

Brian Havey, Asst. U.S. Atty., for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Ledester Lumpkin ("Lumpkin"), Lorna Barker ("Barker"), Janet Blazek ("Blazek"), Patricia Brenner ("Brenner"), Ruth Bush ("Bush"), Joane Hawkins ("Hawkins"), Varnell Owens ("Owens") and Alice Sedlak ("Sedlak") charge Secretary of Veterans Affairs Jesse Brown ("Secretary")—purely in his official capacity, not personally—with age discrimination in the federal workplace in violation of the Age Discrimination in Employment Act ("ADEA," 29 U.S.C. § 633a).[1] Secretary has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56, both sides have complied with this District Court's General Rule ("GR") 12(M) and 12(N) and the motion is fully briefed and ready for decision. For the reasons stated in this memorandum

opinion and order, Secretary's motion is denied except as to Barker, as to whom Secretary prevails.

### Summary Judgment Standards

Familiar Rule 56 principles impose on movant Secretary the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to nonmovant plaintiffs (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). While "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 370–71 (7th Cir.1992); accord, 10A Charles Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 2732.2, at 340 and cases cited at 350–54 n. 11 (2d ed. 1983) and 124–25 n. 11 (1995 pocket part)), that does not negate the potential for summary judgment in cases where a movant plainly satisfies the Rule 56 standards (*Washington v. Lake County,* 969 F.2d 250, 254 (7th Cir.1992)). In those terms summary judgment for Secretary is appropriate if the record reveals that plaintiffs would not "have had a fair chance of obtaining a verdict" based on their having been treated in a statutorily prohibited discriminatory fashion (*Kirk v. Federal Property Management Corp.,* 22 F.3d 135, 138 (7th Cir.1994)).

This District Court designed GR 12 to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes. GR 12(M) requires each Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of each of those facts. Then GR 12(N) requires each nonmoving party to respond point by point, with citations to the record in support of (1) any

---

1. Further citations to ADEA provisions will take the form "Section—," using the Title 29 section numbering rather than ADEA's internal numbering.

claimed disputes as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert.

### Facts [2]

Department of Veterans Affairs ("Department") provides over 172 hospitals and outpatient clinics nationwide with medical equipment and supplies through its Hines, Illinois National Acquisition Center ("Center") (Darr Dep. 8; Duvall Dep. 27). About 100 contract specialists bear primary responsibility for negotiating and monitoring the Center's several billion dollars worth of procurement contracts (Duvall Dep. 27, 90–91; Sedlak Dep. Att. 1; Darr Dep. 8–10). Until 1990 contract specialists typically began at the GS–7 level (trainee) and advanced to GS–9 (full performance) and then to GS–11 and GS–12 (complex assignments) by competing for open slots (P.Ex. 20 ¶4; Cooper Dep.Ex. 4; Bush Dep.Ex. 1 ¶4; Sedlak Dep. 8).

On September 12, 1990 Department began requiring field facilities to submit applications for contract specialists GS–5 through GS–12 and all other positions GS–12 and above to the Washington, D.C. Central Office ("Central Office") for approval (D.Ex. 12). For the Center that meant that before it could hire or promote contract specialists it had to secure the approval of Associate Deputy Assistant Secretary Dale Duvall ("Duvall") in the Office of Acquisitions and Materiel Management (Duvall Dep. 18, 31–32). In practice the Center forwarded appropriate materials to Chief of Personnel Staff Gerard Maresca ("Maresca"), who recommended to Duvall that the application be rejected or accepted (id.). Included in those materials was the standard federal job application form ("SF–171") (Maresca Dep. 127–28). Among other things the SF–171 called for information relating to an applicant's past employment, education and date of birth (P.Ex. 12).

From 1990 through 1993 Lumpkin, Barker, Blazek, Brenner, Hawkins, Owens and Sedlak (all then over age 40) competed unsuccessfully for positions in the contract specialist category for which they qualified. In each instance the slot was filled by a younger applicant (Lumpkin Dep. 10–11, 20–22 and Ex. 1 ¶3; Barker Dep. 10–16; Blazek Dep. 16–19 and Ex. 1 ¶13; Brenner Dep. 18–19; Hawkins Dep. 9–14, 26–27; Owens Dep. 18–19; Sedlak Dep. 21–22). On May 30, 1991 Barker accepted a promotion to GS–9 at a Department facility in Miami, Florida, and in October 1994 she was promoted to GS–11 (Barker Dep. 7–9 and Ex. 1, at Interrogatory Nos. 2 & 3 (referred to at D. 12(m) ¶10 but not attached)). Barker put her Illinois residence on the market but failed to find a buyer until early 1995 (Barker Dep. 23–24, 38). She claims to have stood ready to return to Illinois in the event that her promotional prospects at the Center improved (Barker Dep. 23).

In late 1991 or early 1992 Maresca conducted a review of the Center's personnel practices (including a site visit and an analysis of 20 promotional files (Duvall Dep. 20, 28; Magnuson Dep. 8–9; Maresca Dep. 43–44, 184–85)), from which Maresca concluded that there was a need to "professionalize" the contracting corps (Maresca Dep. 60, 94 and 108)). Apart from several relatively minor recommendations such as more neckties and less nepotism (Maresca Dep.Exs. 3 and 4), Maresca encouraged the Center to take advantage of the federal government's Outstanding Scholars Program ("Program") (Cooper Dep. 17–19; Maresca Dep. 31, 42 and 107–08). Under the Program agencies could bypass usual bureaucratic channels (no written examination, no applications submitted directly to hiring agency) in the initial hiring of college graduates with grade point averages 3.5 and above or class rank within the top 10% (D.Exs. 10 and 11; Prusinski Dep.Ex. 1 ¶1.A.).

---

**2.** In light of the just-stated Rule 56 standards, what follows in this section is not a set of this Court's factual findings, but rather a scenario that credits the pro-plaintiffs evidence together with the required reasonable inferences. With that understanding, the account can avoid the awkward and tedious repetition of such qualifying terms as "allegedly" and "plaintiffs claim" and the like. For convenience, Appendix 1 to this opinion indexes deposition testimony to the parties' exhibits that contain such testimony.

After a period of initial resistance during which it was "repeatedly pointed out to Mr. Maresca that a college degree was not required to enter or advance" in the contract specialist category (Maresca Dep.Ex. 4 ¶ 11), the Center signed onto the idea with one important departure: At Maresca's suggestion the pot for Program participants ("Programees") was sweetened considerably by placing them on noncompetitive career ladders (Palmer Dep. 55; Johnson Dep. 40; Cooper Dep. 30–33). Instead of competing for open slots after they were hired, Programees were to begin at GS–7 and receive automatic promotions up the ladder (to GS–9, then GS–11 and then GS–12) every 54 weeks so long as their work was performed at satisfactory levels (Cooper Dep. 22–23, 30–33 and 75–76; P.Ex. 17).

As indicated in the preceding paragraph, Office of Personnel Management ("OPM") had determined in June 1991 that a college degree was not a requirement of the contract specialist position (Maresca Dep. 25, 104–05; Prusinski Dep.Ex. 1 ¶ 3.E.). Indeed, Department itself undertook no formal study to determine whether and to what extent a college degree related to the job performance of contract specialists (Prusinski Dep.Ex. 1 ¶¶ 3.A. to 3.D.). Before 1992 the percentage of contract specialists with college degrees at the Center was 22 to 23%, less than half of the national average of 47 to 48% for federal agencies such as the Bureau of Indian Affairs, Bureau of Prisons and the like (Maresca Dep. 60–62).

In spring 1992 Assistant Director Thomas Cooper ("Cooper") communicated with placement offices of various local colleges and universities in an effort to recruit Programees (Lumpkin Int. 6; Sedlak Dep. 12; Owens Dep. 12; Magnuson Dep. 15–16; Cooper

Dep. 21–22; Prusinski Dep.Ex. 1 ¶ 2.D.). Those efforts yielded eight recent college graduates (all under 25 years of age), one graduate student (age 30), one teacher (age 38) and two student trainees (both under age 25), all drawn from either Northern Illinois University or Wheaton College (Prusinski Dep.Ex. 1 ¶¶ 2.A. and 2.B.). At that time Lumpkin (age 52) was GS–7, Barker (age 44) was GS–9 (at the Miami facility), Blazek (age 54) was GS–11, Brenner (age 51) was GS–5, Bush (age 58) was GS–11, Hawkins (age 50) was GS–7, Owens (age 52) was GS–11 and Sedlak (age 56) was GS–11 (Lumpkin Aff.; Barker Dep. 6–8; Blazek Aff.; Brenner Dep. 4; Bush Dep. 6 and Aff.; Hawkins Dep. 5, 8; Owens Dep. 5, 9–10; Sedlak Aff.).

■ Brenner is the only plaintiff with a college degree (Lumpkin Dep. 5; Hawkins Dep. 5–6; Bush Dep. 5–6; Sedlak Dep. 5; Blazek Dep. 5; Barker Dep. 6; Owens Dep. 5–6; Brenner Dep. 4–5). Although Brenner was not given an opportunity to apply for the Program, she would not have qualified because of her lower grade point average (Brenner Dep. 5 and Ex. 1 ¶ 5).[3]

Ten full-time Programees started in summer 1992 at the GS–7 level and were promoted noncompetitively to GS–9 in summer 1993. Then the eight who remained at the Center in summer 1994 were automatically promoted to GS–11 (Prusinski Dep.Ex. 1 ¶ 2.C.; Darr Dep. 45–47). Two student Programees who also started in summer 1992 were converted to GS–7 contract specialists in spring 1993 and were promoted to GS–9 one year later (Prusinski Dep.Ex. 1 ¶ 2.C.).

In addition to contract specialists the Center employed a number of support personnel. In June 1992 the Center solicited applications and interviewed candidates for a GS–12 computer programmer. Eventually the ap-

---

**3.** Secretary adds one more point in an effort to defeat Brenner's claim as a matter of law: Her contentious relationship with a supervisor had led to an earlier unsuccessful suit charging Department with discrimination and retaliation (see *Brenner v. Brown*, 36 F.3d 18 (7th Cir.1994)). But that is not at all dispositive here, for the events described in that case antedated the events at issue here by some two years, and in the interim Brenner has been found qualified for

promotions and her performance has been described as "[v]ery well done" by Center division chief Foster Palmer. Under the circumstances the earlier litigation is in no way preclusive here. As *Supporters To Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320, 1326 (7th Cir.1992) puts it:

Traditional principles of preclusion allow additional litigation if some new wrong occurs.

plication of John Hart ("Hart") was forwarded to the Central Office for approval. Maresca reviewed Hart's file and, after consulting with in-house computer guru Edward Kinney, sent this e-mail message to Duvall on June 17 (Maresca Dep. 116–28; Maresca Dep.Ex. 6A) (emphasis supplied):

> The [Center] has requested your concurrence in the selection of MR John Hart for a GS–12 Computer Specialist position. *Mr. Hart was born 7/29 32* and is currently a GS–11 Management Analyst at the Sierra Army Depot at Herlong CA. He is currently responsible for the Acquisition and Control of ADP equipment used in his organization. Mr Hart has had extensive ADP experience in a variety of computer positions starting in 65. In fact MR HART has had 14 positions in 27 years. Mr Hart first became a GS–12 in 68 and took a downgrade in 82 to a GS–11 and sited Personal Advancement. Mr HArt has no degree (64hrs), no training data, no performance evaluation data. I asked [Kinney] to also comment and they question whether the candidate has had oracle experience. They further commented that they would have difficulty making a selection based on the candidates responses to the KSAOs. It should also be noted that only 3 candidates were referred in addition to mr HART. The position was only announced at the GS–11 and GS–12 levels and closed 5/10/92.

> Based on the above recommend you not concur and request additional justification or reaanounce with a greater effort on personnel part to obtain mor highly qualified candidates.

Duvall forwarded Maresca's recommendation to Center Director James Johnson (Lumpkin Dep.Ex. 2).

In early 1993 the Central Office relinquished control over the Center's hiring and promotional decisions (Maresca Dep. 144–45). On June 27, 1993 Nancy Darr ("Darr") signed on as the Center's on-site Associate Deputy Assistant Secretary (Darr Dep. 4). Darr then learned that a number of senior employees were dissatisfied with the Program (*id.* 51). In an effort to "level the playing field" (*id.* 60, 100–01) Darr asked OPM to conduct across-the-board desk audits in summer 1994 (Blazek Dep. 6–7; Darr Dep. 53). As a result promotions were given to a number of contract specialists, including Blazek, Bush and Sedlak (all of whom were bumped up from GS–11 to GS–12) (P.Exs. 4, 5, and 6; Darr Dep. 53, 90–91). In accordance with a confidential settlement in another lawsuit, on September 30, 1994 Owens retired and was promoted to GS–12 retroactive to April 1992 (Owens Dep. 7–8; Darr Dep. 89–91). Darr encouraged all Center employees to continue their education and set up a University Without Walls at which they could take afternoon classes free of charge (*id.* 20–22, 92–94).

*Procedural History*

On October 19, 1993 Plaintiffs filed their EEOC charge, alleging that noncompetitive promotions of Programees in May 1993 had violated the Section 633a prohibition against age discrimination in the federal workplace. When Plaintiffs then brought this action, their original Complaint ¶ 13 reflected principal reliance on a disparate impact theory. Secretary moved under Rule 12(c) for judgment on the pleadings, asserting that *EEOC v. Francis W. Parker School,* 41 F.3d 1073 (7th Cir.1994) had closed the door on ADEA disparate impact cases in this Circuit. Plaintiffs responded by way of a First Amended Complaint ("FAC") that for the most part recast their allegations in disparate treatment form. FAC ¶ 12 alleged that by routinely denying competitive promotions to qualified older workers Department had "implement[ed] a policy or practice whereby the age of an older employee was deemed to be a negative criterion in the promotional equation." And FAC ¶ 15 alleged that the Program had furthered that illicit purpose by "depriv[ing] promotional opportunities to older employees" and had been a "pretextual device that discriminate[d] against plaintiffs on account of their age."

As stated at the outset, Secretary has moved under Rule 56 for summary judgment. In doing so Secretary (1) has reasserted the

position that disparate impact theory is unavailable to plaintiffs, (2) has challenged the ability of several plaintiffs to establish a prima facie case of intentional age discrimination and (3) has defended the Program as reflecting a nondiscriminatory decision to increase the number of college graduates within the contract specialist category. Although it is not entirely clear whether plaintiffs continue to advance both disparate impact and disparate treatment theories, each has certainly been injected into the case, so they will be considered seriatim.

### Disparate Impact

■ First recognized under Title VII (42 U.S.C. §§ 2000e to 2000e–17) in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), disparate impact theory treats facially-neutral employment policies that adversely impact a protected class as discriminatory even without any showing of the employer's intent—unless, that is, the employer shows that the policies respond to some business necessity (accord, *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977)). Although there are a number of respects in which Title VII jurisprudence and ADEA jurisprudence have traveled the same road, the Supreme Court "ha[s] never decided whether a disparate impact theory of liability is available under the ADEA" (*Hazen Paper Co. v. Biggins,* —— U.S. ——, ——, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993), citing then Justice Rehnquist's dissent from denial of certiorari in *Markham v. Geller,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981); see also Michael Sloan, Comment, *Disparate Impact in the Age Discrimination in Employment Act: Will the Supreme Court Permit It?,* 1995 Wis.L.Rev. 507 (1995)).

Since the landmark decision in *Griggs,* however, several Courts of Appeals have imported the disparate impact concept into ADEA (e.g., *MacPherson v. University of Montevallo,* 922 F.2d 766, 770–71 (11th Cir. 1991); *Abbott v. Federal Forge, Inc.,* 912 F.2d 867, 872 (6th Cir.1990); *EEOC v. Borden's Inc.,* 724 F.2d 1390, 1394–95 (9th Cir. 1984); *Leftwich v. Harris–Stowe State College,* 702 F.2d 686, 690 (8th Cir.1983); *Geller v. Markham,* 635 F.2d 1027, 1032 (2d Cir. 1980)). Among the reasons stated for those decisions, the most obvious was the striking similarity between the language of Title VII upon which *Griggs* had relied (42 U.S.C. § 2000e–2(a)) and Section 623(a) (see, e.g., *Borden's,* 724 F.2d at 1394; *Geller,* 635 F.2d at 1032; and see generally Charles Sullivan & Michael Zimmer, *Proving a Violation under the Age Discrimination in Employment Act of 1967* ["Sullivan & Zimmer"], 17 Seton Hall L.Rev. 803, 831–39 (1987)).

That approach drew criticism from some commentators on the ground that it ignored a distinction between the two statutes: Section 623(f) sets out a defense that legalizes any employment "based on reasonable factors other than age"—a defense that has no precise Title VII parallel (see, e.g., Pamela Krop, Note, *Age Discrimination and the Disparate Impact Doctrine,* 34 Stan.L.Rev. 837, 844–48 (1982); Sullivan & Zimmer, 17 Seton Hall L.Rev. at 832–33)). That distinction was relied upon in *Francis Parker,* 41 F.3d at 1077 to adopt the view, expressed several years earlier in Judge Easterbrook's dissenting opinion in *Metz v. Transit Mix, Inc.,* 828 F.2d 1202, 1220 (7th Cir.1987), that Section 623(f) should be read as having taken disparate impact out of Section 623.[4] *Francis Parker,* 41 F.3d at 1077–78 further reasoned that 42 U.S.C. § 2000e–2(a)(2) does not mirror Section 623 exactly, because in 1972 the former was expanded to encompass "applicants for employment" while ADEA has no such provision. Our Court of Appeals, *id.* at 1076–77 also drew upon language in *Hazen Paper* to conclude that "decisions based on criteria which merely tend to affect

---

4. Interestingly, EEOC has drawn upon *exactly the same language* to read disparate impact *into* ADEA (see Section 628 and 29 C.F.R. §§ 1607 and 1625.7, cited "Reg. § —"). Reg. § 1625.7(d) provides that employment practices that are defended as "differentiation[s] based on reasonable factors other than age" are to be scrutinized under Reg. § 1607. Reg. § 1607 requires selection procedures that have an adverse impact on the protected class to be validated in accordance with elaborate guidelines, designed to make certain that the purported "reasonable factor" is significantly related to job performance.

workers over the age of forty more adversely than workers under forty are not prohibited" by ADEA (*id.* at 1077) (accord, *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1125–26 (7th Cir.1994)).

■ Here the twist is that plaintiffs are federal employees and therefore seek relief under Section 633a, not Section 623. Section 633a contains no textual counterpart to Section 623(f), and by its terms it is the exclusive prohibition against age discrimination within the federal government (Section 633a(f)). If the plain language of Section 633a(f) had left any doubt on the latter point, *Lehman v. Nakshian,* 453 U.S. 156, 168, 101 S.Ct. 2698, 2705–2706, 69 L.Ed.2d 548 (1981) would have dispelled it by its statement that the enactment of Subsection (f) in 1976 "clearly emphasized" that Section 633a embodies a "self-contained" prohibition against age discrimination in the federal workplace, "unaffected by other sections, including those governing procedures applicable in actions against private employers."

We are thus left largely without compass from our Court of Appeals on the issue of disparate impact as to federal employees, for the key statutory language—Section 623(f)'s "reasonable factors other than age"—that was relied upon in Judge Easterbrook's *Metz* dissent and then in *Francis Parker* is wholly·missing from Section 633a. Moreover, the phrase "applicants for employment"—the absence of which from Section 623(a)(2) was deemed noteworthy by *Francis Parker,* 41 F.3d at 1077–78—is present in Section 633a(a). And last, as a disparate treatment case brought under Section 623 *Hazen Paper* cannot fairly be viewed as having considered the very different situation here: disparate impact under Section 633a.

■ But we are not wholly adrift. Judge Easterbrook's *Metz* dissent began its disparate impact discussion by observing (828 F.2d at 1216):

> The ADEA was enacted in 1967, before the first of the disparate impact cases (*Griggs,* in 1971), so we cannot be confident that the Act adopted this method.

At least by inference, that suggests that had the time sequence been otherwise—had Section 623 been enacted after *Griggs*—the statute could properly have been viewed as incorporating the disparate impact theory. And that is exactly the situation here: Section 633a was not adopted until 1974, fully three years *after* the well-publicized *Griggs* opinion (see *EEOC v. Elrod,* 674 F.2d 601, 604–05 (7th Cir.1982), noting that the legislative history of the 1974 ADEA amendments extending its coverage to governmental employees is otherwise scant because sweeping Fair Labor Standards Act amendments of that same year overshadowed what was happening in the ADEA context). For purposes of the present motion, then, it may fairly be assumed that as to federal employees the courts (including our Court of Appeals) would still recognize a disparate impact theory under Section 633a (as was done pre-*Francis Parker* in such cases elsewhere as *Palmer v. United States,* 794 F.2d 534, 538–39 (9th Cir.1986) and *Klein v. Secretary of Transportation,* 807 F.Supp. 1517, 1524 (E.D.Wash.1992)).

■ What is plaintiffs' disparate impact case? They have shown (1) that Department created special noncompetitive career ladders for college graduates with high grades or class rank, (2) that those ladders were marketed exclusively through the recruitment offices of a very small number of local colleges and universities (apparently only Northern Illinois University and Wheaton College) and (3) that 10 of the 12 Programees selected were under age 25, with the other 2 being 30 and 38 years old. Secretary has attempted no showing of business necessity except to refer generally to the importance of a college education—and even that is undercut by OPM's express determination that a college degree was *not* a requirement for the job at issue and by Department's failure to link that factor to job performance. On those facts Secretary's motion for summary judgment must surely be denied. On the current record a reasonable judicial factfinder[5] could conclude that the aspect of the

---

5. *Lehman,* 453 U.S. at 168–69, 101 S.Ct. at 2705–2706 has confirmed that "Congress did not

depart from its normal practice of not providing a right to trial by jury when it waived the sover-

Program at issue here—the automatic non-competitive promotions afforded to its beneficiaries—had a significant adverse impact on 40–year–old–and–over employees and applicants for employment within the contract specialist category at the Center, without any showing of business necessity.

In terms of the individual plaintiffs here, that same reasonable factfinder could conclude that contract specialists at levels GS–11 and below who were at the Center at the relevant time (more on this subject later) were actionably aggrieved by the Program. That appears to include Lumpkin, Blazek, Brenner, Bush, Hawkins, Owens and Sedlak—all except Barker. Those plaintiffs were arguably frozen out of any opportunity to participate in noncompetitive career ladders and were forced to compete for an increasingly shallow pool of GS–9, GS–11 and GS–12 positions. It is also reasonably inferable from the promotions that followed Darr's desk audits that older GS–11 contract specialists (including Blazek, Bush and Sedlak) were being used to hold GS–12 slots open while Programees climbed their ladders.

As for Barker, she had moved to Miami in May 1992 and was thus neither an employee nor an applicant for employment at the Center during the relevant period. Barker says that she would have returned to Illinois had a promotional opportunity arisen, and it is true that her local residence remained on the market through early 1995. But her assertion is undercut (1) by the fact that she put her house up for sale (as opposed to renting it out),[6] (2) by the two promotions that Barker received at the Miami facility and (3) by the absence of a single complaint on her part as to her treatment there. In sum, it would not be reasonable to conclude that Barker would have taken advantage of promotional opportunities that might have arisen at the Center after May 1992—she had found a new professional home for herself in Florida.

*Disparate Treatment*

 To defeat Secretary's motion for summary judgment on a disparate treatment theory, plaintiffs must create a reasonable inference that age actually motivated the employment decisions or practices in issue (*Hazen Paper,* —— U.S. at ——, 113 S.Ct. at 1706). It is familiar doctrine that plaintiffs may do so in either of two ways:

1. They can seek to establish discriminatory animus directly by way of employer admissions, suspicious timing, indiscreet statements, systematically more favorable treatment of younger employees and the like.

2. They can employ the familiar burden-shifting framework set out originally for Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and since applied to ADEA claims (see, e.g., *Sirvidas v. Commonwealth Edison Co.,* 60 F.3d 375, 377 (7th Cir.1995) and cases cited there).

Here P.Mem. 6–15 indicates that they have chosen the *McDonnell Douglas* route.

 Within that framework plaintiffs have the initial burden of establishing a prima facie case of age discrimination. As to Barker, the same factors that have been described at the end of the *Disparate Impact* section operate to defeat any potentially timely claim of disparate treatment. All the other plaintiffs, however, have met their threshold burden.

 Lumpkin, Barker, Blazek, Brenner, Hawkins, Owens and Sedlak satisfy that burden by showing membership in the protected class (they are federal employees age 40 and above), eligibility for a position (they applied and qualified for competitive promotions between 1990 and 1993), adverse action (they were denied promotions) and more favorable treatment of younger employees (their promotions were granted automatically). And although Bush did not apply for a promotion during the relevant period and therefore fails to state a prima facie case

eign immunity of the United States" in ADEA litigation.

6. There are of course a host of market-related reasons that a home may remain unsold. No probative value really attaches to the bare fact that such was the case with Barker's house.

in the traditional sense, she has done so in the alternative manner prescribed in *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 523 (7th Cir.1994): by making a sufficient showing (1) that Department's decision not to make noncompetitive promotions available to contract specialists over age 40 was illegitimately motivated and (2) that but for such practice she likely would have been approached and would have accepted the offered position. In fact, all the plaintiffs other than Barker make out that second prima facie case.

■■■ That raises a presumption of age discrimination, requiring Secretary to articulate some legitimate nondiscriminatory reason for Department's actions. Secretary surmounts that low hurdle by stating that competitive promotions were awarded to the most qualified applicants regardless of age and that the Program was designed to attract and retain college graduates. That returns the burden of production to plaintiffs, who must then create a reasonable inference of intentional age discrimination. In that last step of the ping-pong match, a showing of "pretext"—that is, that Secretary's purported explanation is a fake—does not compel a finding of discriminatory intent, but it may be used (along with other evidence, if any) to infer the prohibited intent (*St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993); *Anderson*, 13 F.3d at 1123–24).

Here the matter is complicated by the fact that two distinct areas of decision are at work: (1) the several individual decisions to deny competitive promotions to plaintiffs and (2) the overarching decision to deny them noncompetitive promotions by structuring the Program to plaintiffs' exclusion. But as a practical matter the inquiry can be condensed, for the decisionmaker in each instance was Maresca—he was the driving force behind the Program and was also the Central Office employee responsible for recommending that an individual promotion be approved. If then a reasonable inference can be drawn that the Program resulted from

Maresca's desire to replace the Center's aging workforce with a crop of young go-getters, it may also be inferred just as reasonably that Maresca's case-by-case decisions were propelled by the same illicit force. That focuses attention directly on the Program, which of course has been the centerpiece of this case since its beginning.

At least three aspects of the Program can reasonably be viewed as implying that what Department had in mind was age. They may be ticked off in succession, though it is plainly unnecessary for plaintiffs to establish all of them to stave off summary judgment.

■■■ First is the very way that the Program was structured. Secretary claims that Department was interested in closing the gap between the percentage of contract specialists with college degrees at the Center (22–23%) and the percentage at other federal agencies (47–48%). Toward that end Secretary says Department created the special noncompetitive career ladders and offered them to college students and teachers at local colleges and universities. But plaintiffs have more than created a genuine factual issue as to whether a college education was a prerequisite to the position and even as to whether it added to an employee's ability to perform his or her assignments. At about the same time that Maresca was pushing the Center to adopt the Program, OPM expressly determined that a college education was not required of contract specialists, and until Maresca convinced it otherwise the Center appears to have agreed. What that goes to is pretext: If a college degree was of marginal (if any) benefit, then by definition Department's articulated rationale is suspect.[7]

■■■ Next is the troubling way in which the Program was marketed. Plaintiffs have shown that the recruitment efforts were restricted to college campuses. Wholly predictably, those efforts harvested tender fruit. That too tends to undermine Secretary's nondiscriminatory explanation. Even on the as-

---

7. Of course to the extent that the differing views reflected a simple disagreement within Department as to the value of a college education for the job, the factfinder would not be permitted to second guess Department's business decisions (see, e.g., the penultimate paragraph of the substantive discussion in *Sample v. Aldi Inc.* 61 F.3d 544 (7th Cir.1995)). But that is not involved in the present Rule 56 context, where the pro-plaintiffs perspective must be adopted.

sumption that a college education was a legitimate job factor, if then college degrees (as contrasted with college-age students) were what Department sought, there were a plethora of wholly unexplored recruitment possibilities that would have provided a pool of prospective employees that was not at all age-biased. Hence the factfinder could certainly consider that the nature of the Center's recruitment efforts reflect an obvious preference for youth.

█ Third is the Program's aftermath. Darr's desk audits in summer 1994 revealed that at least three contract specialists over age 50 were actually working at the GS–12 level, even though they were rated at the lower GS–11 level. At that time eight Programees were slated to turn GS–12 in summer 1995. That situation can plainly be perceived by a reasonable factfinder as one in which senior GS–11s were being used to hold GS–12 slots open until the Programees could be placed into that final rung of their career ladders. And such second-class treatment of highly qualified older workers would constitute disturbing evidence of discriminatory intent.

It is thus really an understatement to hold, as this Court does, that a rational trier of fact could conclude that the Program constituted intentional age discrimination in violation of Section 633a. There are several material issues of fact that bear on whether the Program was intentionally designed to prefer the young at the expense of the old. And this Court also finds that in light of Maresca's dual role, a reasonable factfinder could conclude that the same discriminatory animus that motivated the Program (and hence impacted the May 1993 promotions) played a determinative role in the earlier individual decisions to deny competitive promotions to plaintiffs.[8]

### Continuing Violations?

That last finding, however, highlights an issue that has not been addressed by the parties: whether any of plaintiffs' claim may be viewed as having arisen more than 180 days before the filing of the October 1993

8. See Appendix 2.

EEOC charge, so as to be time barred (see Section 633a(d)). That issue would seem to place into question (or at least to require further discussion of) the claims by several plaintiffs that they were repeatedly denied competitive promotions on account of age beginning in September 1990.

One example of the significance of that issue (though not the only one) is Owens, who appears to rely solely on that earlier conduct—as the record reflects, he was made whole so far as the Program is concerned through a promotion to GS–12 retroactive to April 1992. Owens' claim and any others arising before the April 1993 cutoff date (180 days earlier than the October 1993 EEOC charge) may or may not be saved by the so-called "continuing violation" doctrine discussed in some detail in *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 445–46 (7th Cir.1994) and *Selan v. Kiley*, 969 F.2d 560, 564–67 (7th Cir.1992). Because the parties have not dealt with that question at all, no definitive ruling is possible at this time as to precisely which claims (and, in part, precisely which plaintiffs) survive Secretary's Rule 56 motion.

### Conclusion

Secretary's motion for summary judgment is denied in all respects except as to Barker. In that one instance there is no genuine issue of material fact, and Secretary is entitled to a judgment as a matter of law dismissing Barker's action. As to the other plaintiffs' claims, this action is set for a status hearing at 8:45 a.m. September 28, 1995, at which time both sides' counsel should come prepared to discuss the procedures needed to address the open issue referred to in the preceding section and to ready the case for a prompt trial.

### Appendix 1

| Deponent | P.Ex. | D.Ex. |
|---|---|---|
| Barker, Lorna | | 7 |
| Blazek, Janet | | 6 |
| Brenner, Patricia | | 9 |
| Bush, Ruth | | 4 |
| Cooper, Thomas | 15 | 16 |
| Darr, Nancy | | 2 |
| Duvall, Dale | 14 | |

| Deponent | P.Ex. | D.Ex. |
|---|---|---|
| Johnson, James | 14 | |
| Hawkins, Joane | | 3 |
| Lumpkin, Ledester | | 1 |
| Magnuson, Gerald | | 15 |
| Maresca, Gerald | 21 | 13 |
| Owens, Varnell | | 8 |
| Palmer, Foster | 2 | |
| Prusinski, Ray | 30 | |
| Sedlak, Alice | | 5 |

### Appendix 2

This opinion has deliberately eschewed any reliance on what plaintiffs inexplicably view as the smoking gun of the case: the supposedly damning reference to Hart's age in the June 17 e-mail. Even apart from the minimal probative value that particular item appears to possess (at least to this Court), the proper treatment of such snippets on motion for summary judgment is a dicey problem. On the one hand, it is of course obvious that an employer's own words can constitute compelling proof of discriminatory intent (see, e.g., this Court's recent opinion in *Goodman v. Heitman Fin. Servs.,* 894 F.Supp. 1166 (N.D.Ill.1995)). On the other side of the coin, it would be unreasonable to demand that employers excise completely from their vocabularies the words "age" and "born" and the like, and in any event the statute does not require that. What is after all forbidden is age *discrimination,* and only language that reflects meaningfully upon discriminatory intent is pertinent.

There is also a practical concern that plaintiffs with dead-bang loser employment discrimination cases should not be given an incentive to prolong discovery and to increase costs by trolling through an employer's records on the off-chance of running across some passing and nonmaterial reference to age or the employee's date of birth. If every purportedly age-related utterance of that nature were able to stave off summary judgment, then the task of even the most hopeless plaintiff would be obvious: Find it.

In that respect, *Robinson v. PPG Indus., Inc.,* 23 F.3d 1159, 1164–66 & n. 3 (7th Cir.1994)—drawing on language from *Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (Justice Brennan's four-Justice plurality opinion), 277 (Justice O'Connor's concurrence) (1989)—has employed the term "stray remarks" to distinguish innocuous from invidious statements (see generally Ann McGinley, *Credulous Courts and the Tortured Trilogy: The Improper Use of Summary Judgment in Title VII and ADEA cases,* 34 B.C.L.Rev. 203, 213 n. 37 and 219 n. 63 (1993) and cases cited there). *Robinson* makes clear that what is really involved is a case-by-case determination of the probative force of the supposed smoking gun.

To return to the specific item of "evidence" to which plaintiffs point here, the June 17 e-mail, at least to this Court it carries no weight as an indication of discriminatory intent. Maresca copied Hart's date-of-birth from the SF 171 and typed it into his memorandum along with the applicant's name, residence and other background information. Hart's application appears to have been considered entirely on the merits, including consultation with a third-party computer expert. In any event, however, no ultimate evaluation of the item is necessary because the current motion has been decided in plaintiffs' favor on the strength of other evidence.