Ledester LUMPKIN, et al., Plaintiffs,

v.

Jesse BROWN, Secretary of Veterans
Affairs, Defendant.

No. 94 C 3637.

United States District Court,
N.D. Illinois,
Eastern Division.

April 22, 1997.

Stephen B. Horwitz and Thomas J. Angell
of Jacobs, Burns, Sugarman, Orlove & Stan-
ton, Chicago, IL, for plaintiffs.

Jack Donatelli and Kathryn A. Kelly, Chi-
cago, IL, for James B. Burns, U.S. Atty.

*FINDINGS OF FACT AND
CONCLUSIONS OF
LAW* [1]

SHADUR, Senior District Judge.

Ledester Lumpkin ("Lumpkin"), Janet
Blazek ("Blazek"), Patricia Brenner ("Bren-
ner"), Ruth Bush ("Bush"), Joane Hawkins
("Hawkins") and Alice Sedlak ("Sedlak") are
the plaintiffs remaining in this Age Discrimi-
nation in Employment Act ("ADEA") action
against Secretary of Veterans Affairs Jesse
Brown ("Secretary") after the issuance of the
Opinion (see n. 1). Following a bench trial,
counsel for the litigants have provided their
respective proposed Findings and Conclu-
sions, and what are set out here represent
this Court's resolution of the issues through
its own Findings and Conclusions. To the
extent (if any) that the Findings as stated
here may be deemed conclusions of law, they
shall also be considered Conclusions. In the

---

1. In the interest of consistency, these Findings of
Fact ("Findings") and Conclusions of Law
("Conclusions") will employ the same defined
terms as this Court's September 13, 1995 memo-
randum opinion and order ("Opinion," 898
F.Supp. 1263). References to the Opinion will
take the form "Opinion at ——," reflecting the
F.Supp. page number without repeating the vol-
ume number.

same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both those respects, see *Miller v. Fenton*, 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

1. Jesse Brown is Secretary of the Department of Veterans Affairs ("Department"), whose National Acquisition Center ("Center") is a facility located in Hines, Illinois. Center is responsible for procuring medical equipment and supplies needed by medical centers and health care centers (more than 172 in number) administered by Department as well as other government agencies. Department's Hines facility is responsible for government contracts totaling billions of dollars. Stip. ¶ 1.[2]

2. Department's employees at Center who are responsible for activities in connection with the solicitation, negotiation and award of contracts are classified as "contract specialists (series 1102)." Stip. ¶ 2. To enter into contracts on behalf of the United States and thus obligate government funds, a contract specialist must be awarded a warrant authority, and to secure such authority a contract specialist has to undergo four levels of classroom training. P.Ex. 21A at 1–13 to 1–14. Warrants begin at the basic amount of $25,000 and go up to an "unlimited" amount. Compare P.Ex. 20A, C and F with P.Ex. 20B; Cooper Dep. 78. No contract specialist is permitted to enter into a contract that exceeds her warrant authority.

3. Under the United States' Outstanding Scholar Program ("Program"), agencies of the federal government may award "entry-level positions (GS–5/7)" to "college graduates who have an overall academic grade-point average (GPA) of 3.[5] or better, or who graduated in the top 10% of their class...." P.Ex. 3. Applicants who satisfy the Program's academic qualifications can be hired into entry level jobs without taking a competitive entrance examination. Amended Ans. ¶ 13; P.Ex. 1 at 27, P.Ex. 2 ¶¶ 6–8, P.Ex. 10.

4. Contract specialist is a job classification that does not require a college degree (Office of Personnel Management, which alone has the authority to establish such job requirements in the federal government, has determined that contract specialists need not possess a college degree regardless of their GS levels). It is therefore undisputed that a "college degree is not a validated job related requirement" for a contract specialist position. Stip. ¶ 6; P.Ex. 30 ¶ 3D. Nevertheless the contract specialist (series 1102) classification is one of some 112 job titles in the federal government that can be filled on an entry level basis through utilization of the Program. P.Ex. 3.

5. Although a college degree is not a prerequisite for a contract specialist position, it was of course permissible for Department to use a means such as the Program in an effort to encourage persons having high academic qualifications to enter service with Department in such positions. What was *not* permissible was Department's coupling of the Program with an automatic promotion track—a track that would serve to advance, on an automatic basis that was totally unavailable to the over–40 contract specialist incumbents such as plaintiffs, such newly-hired entry-level employees, all of whom were recruited under circumstances that assured that the recruits were much younger than such incumbents, who were thus foreclosed from competing for such advancement—and to do so in order to prefer the young recruits over the incumbents in the ADEA-protected class.

6. In September 1990 Department's Office of Acquisition and Material Management in Department's Washington, D.C. Central Office ("Central Office") began to require Department's field facilities, including Center, to obtain Central Office approval for all employment selections within the contract specialist classification, GS–5 through GS–12. Stip. ¶ 4; P.Ex. 4; Darr Dep. 41–42. Gerard Maresca ("Maresca") was the official responsible for drafting that policy. Maresca was the chief of personnel at the Central Office,

---

**2.** All "Stip." citations refer to stipulations included in the final pretrial order. "Tr.—" refers to the trial transcript, and "Dep.—" refers to witness depositions. "P.Ex." and "D. Ex." respectively refer to plaintiffs' and defendant's exhibits.

in which position he had authority over all personnel programs and operations at Center. Stip. ¶ 4. Pursuant to the directive that Maresca drafted dated September 12, 1990, Center could neither hire nor promote contract specialists unless it had first secured the approval of Assistant Secretary Dale Duvall ("Duvall"). But in practice it was Maresca who recommended whether Duvall should accept or reject an application. Duvall Dep. 13, 18.

7. In the fall of 1991 Chief of Personnel Maresca began discussions with Center's management officials about the selection and advancement of personnel for contract specialist positions at Center. Center's Assistant Director Tom Cooper ("Cooper") first learned about the Program during that period in conversations he had with Maresca, one of his superiors. Cooper Dep. 17–18. Cooper's November 5, 1991 memorandum outlined a plan to recruit Program candidates "at area colleges," just as Maresca had instructed him to do. P.Ex. 5; Cooper Dep. 46, 73. And while Program recruits ("Programees") would be hired into GS–7 contract specialist openings, Cooper knew from his conversations with Maresca that the latter wanted all Program candidates to be on a GS–7 to a GS–12 promotional track such that the Programees would advance on that noncompetitive career track in four years' time. Cooper Dep. 33, 75–76.

8. In April 1992 Maresca made a rare onsite visit to Center. In a get-together in the office of acting personnel chief Gerald Magnuson ("Magnuson"), with other personnel officers from the supply depot at Hines [3] also present, the subject was mostly personnel shop talk. Tr. 104–07; Magnuson Dep. 9–10. It was only at a second meeting—in the office of Center's Director James Johnson ("Johnson")—that Maresca got down to

brass tacks on how to deal with the 20 or so unfilled vacancies in the rank of contract specialists at Center. And it was in that context that Maresca explained that the Program was "an alternative to the Merit Promotion Plan." Tr. 32; Magnuson Dep. 10.

9. If Maresca's April 1992 visit was intended to relieve the "bottleneck" in the selection of contract specialists at Center, Maresca need not have traveled from his office in Washington to Center for a solution. As Magnuson testified, the bottleneck was of Maresca's own making and was a direct outgrowth of his September 1990 directive that required Central Office's approval before Center could hire or promote contract specialists. Magnuson Dep. 14; Maresca Dep. 60. Foster Palmer ("Palmer"), a division chief at Center since 1974, also met with Maresca during the latter's April 1992 visit to Center. When Palmer pointed out to Maresca that the requirement of Central Office approval was "hamper[ing] the operation by not getting the work done," "Mr. Maresca's response" was that the Program—a program Palmer was not familiar with—"was the only way" that the contract specialist vacancies could be filled, with Maresca explaining that the Programees were to be on "a promotional ladder position of 7 through 12." Palmer Dep. 17–20, 55.

10. Of the various personnel topics on Maresca's agenda during his April 1992 meetings at Center (P.Ex. 6),[4] the one proposal that Maresca advanced that did materialize with concrete results was his Program initiative. Magnuson Dep. 15. Hence Program candidates, who were recruited exclusively at Chicago area colleges during the spring and summer of 1992 (Palmer Dep. 19, Cooper Dep. 30, 46), were appointed on a noncompetitive basis to GS–7 positions, and they were simultaneously placed on noncom-

---

**3.** Magnuson and his staff had responsibility over the personnel affairs for both Center and the supply depot at Hines. Tr. 28–29.

**4.** Maresca later incorporated that agenda into "findings" and "recommendations." P.Ex. 7A. Center Director Johnson found Maresca's critiques, especially his fixation with college graduates, to be unjustified. P.Ex. 7B. Johnson had "serious reservations regarding the accuracy" of the "findings," particularly as they pertained to

Maresca's "impression" that Center contract specialists "are generally uneducated and unprofessional." Johnson "challenge[d]" Maresca's contention that the percentage of Center's contract specialists with college degrees was "well below average," with Johnson noting that 42% of Center contract specialists had degrees, compared to "a poll taken of the Chicago area VAMCs [that] indicated that only one (1) 1102 had a degree." P.Ex. 7B ¶ 3.

petitive career ladders that could elevate them to GS–12 jobs within three years. Amended Ans. ¶¶ 13–14; P. Exs. 14B–E, 23A–B.

11. By the time that the 12 Programees were hired at Center in the summer of 1992 (Stip. ¶ 30; P. Ex, 9), personnel officer Magnuson had already prepared position descriptions for the contract specialist jobs that the Programees would fill, and those position descriptions—some dated as early as May 20, 1992—classified those positions as career ladder jobs with promotional potential from GS–7 to GS–9 to GS–11 to GS–12. P. Exs. 22–A–B, 23C; see also P. Exs. 14B, 14E, 14H, 14J, 14K; Magnuson Dep. 33–35. Magnuson testified that in preparing those position descriptions so that Programees were placed on noncompetitive career ladders from GS–7 to GS–12, he followed Maresca's "suggestion" to that effect. Tr. 30; Magnuson Dep. 36. Magnuson's management colleagues at Center similarly identified Maresca as the Central Office official responsible for germinating the idea of placing Programees on noncompetitive career tracks from GS–7 to GS–12. Magnuson Dep. 65, Cooper Dep. 33, Johnson Dep. 21–22, Palmer Dep. 19.

12. Secretary has acknowledged in his Response to Supplemental Interrogatories ¶ 8b that "[t]he decision to recruit Outstanding Scholars for Grade 7/9/11/12 career ladder positions was made approximately in the Spring of 1992 after receiving Mr. Maresca's recommendations." Although Maresca testified that Johnson, Magnuson, Cooper and Palmer must have misunderstood him if they testified (as they did) that Maresca came up with the idea to place Program recruits on noncompetitive career ladders, this Court discredits Maresca's testimony and credits the testimony of the other witnesses.

13. According to Maresca, as far as he knew Programees had been hired on a GS–7/9 career ladder (Dep.148–50):

I spoke to Mr. Magnuson, Jerry Magnuson, being the personnel officer or personnel specialist at the NAC. I asked him about the hiring of the outstanding scholars, at what career ladder they were hired.

He advised me that they were hired under the old GS–9 career ladder positions.

\* \* \* \* \* \*

[T]he question asked was: How were they hired? I was told by Mr. Magnuson under the GS–9 career ladder.

\* \* \* \* \* \*

[T]hey were hired with promotional potential to nine.

\* \* \* \* \* \*

[T]hey could not advance beyond nine without further competition.

Magnuson, however, refuted Maresca's account, and this Court credits Magnuson's testimony (Dep.45–46) and discredits Maresca's:

Q. Did you ever tell Mr. Maresca that his suggestion to you ... made in April of '92 ... that outstanding scholars being put on a career ladder GS–7/9/11/12 had only been hired under a GS–7/9 authority?

A. No.

\* \* \* \* \* \*

Q. [After reading from Maresca's deposition testimony so stating] Do you recall having such a conversation with Mr. Maresca?

A. No, I don't.

14. Maresca's purported conversation with Magnuson, in which the latter supposedly told Maresca that Programees were hired on the "old GS–9 career ladder," allegedly occurred in late August or early September 1992, and is reflected in Maresca's purported "reply" to a September 4, 1992 e-mail message from Duvall to *Johnson.* P.Ex. 29. But Duvall himself raised serious doubts about the authenticity of that document: Duvall testified that he had never seen the contents of the so-called reply, that the contents were "strange" and "nonresponsive" to his e-mail message and that he believed the reply had been created by someone "manipulating" the e-mail system. Tr. 490; Duvall Dep. 84–85. Moreover, it would have been wholly incongruous for Magnuson to have made any such response to Maresca: After all, Magnuson was the very person who completed the paperwork earlier in the summer

of 1992 placing Programees on the GS–7/9/11/12 noncompetitive career ladders—just as Maresca had instructed. P. Exs. 23B and 23C; see also P.Ex. 14B, which reveals that on June 29, 1992 Magnuson approved a Programee's career ladder to Grade 12; and see also P.Ex. 14C, a June 28, 1992 notification of personnel action bearing Magnuson's signature, which notes that the GS–7 contract specialist job that the Programee was being hired into "is developmental to GS–12." All of this also strongly supports this Court's already-expressed discrediting of Maresca.

15. To the same effect, Maresca claimed in his Dep. 153–54 that it was some two years later (after this action had been brought in June 1994) that he was disabused of the notion (purportedly gained in his supposed, but in fact nonexistent, conversation with Magnuson in late August or early September 1992) that Programees were hired only on a GS–9 career ladder:

Q. Did you learn at some point in time after this memo of September 4, '92 ... that the information Mr. Magnuson gave you, that the individuals hired under the OSP in '92, capped out at a GS–9 was not true?

A. Yes.

Q. How did you learn that?

A. I believe I had a discussion with Ms. Darr. Ms. Darr being the new director at the NAC. She advised me that, no, that was not true, that apparently these people were hired with higher career ladders. I am not sure when. It was not too long ago. I can't pinpoint a date.

Q. When you say not too long ago, you mean in the last few months?

A. Probably around the time the case came up.

\* \* \* \* \* \*

Q. But while this case here, the Lumpkin case was pending?

A. Right. I was under the impression that these people were hired with a career ladder to grade nine.

But that version too was discredited, this time by Johnson's successor as Center's director, Nancy Darr ("Darr") (Dep. 64–65, 69; see also Tr. 369):

Q. ...Mr. Maresca testified he had a conversation with Mr. Magnuson that said the OSP people were hired into GS–7/9 positions, and the testimony I just read to you indicates that Mr. Maresca had a conversation with you since this lawsuit was filed in 1994 in which you told him that was not true, that the OSP people were hired up to a GS–12 level. Do you recall that conversation?

A. I do not recall the conversation.

Q. From what you told me ... you do not even know under what authority the ... OSP people were hired under, correct?

A. That is correct.

Q. So you would never have had a conversation telling Mr. Maresca that these people were hired up to a career level GS–12, would you?

A. I would not have made that statement myself without having checked it out with somebody because I wouldn't have had that background and that factual information.

\* \* \* \* \* \*

Q. ... [D]id Mr. Maresca ever indicate to you that it was his understanding that the outstanding scholar participants who were hired back in '92 ... were on a career ladder only up to GS–9 and you told him that he was misinformed, that they were up to a higher level?

A. I do not recall that.

16. Duvall also offered some added probative evidence as to Maresca's impermissible age-based motivation.[5] In the spring of 1992, at the very time that Center—at

---

**5.** Opinion at 1275 explained why, in denying Secretary's summary judgment motion, this Court "deliberately eschewed any reliance on what plaintiffs inexplicably view as the smoking gun of the case": the matter discussed in this Finding. But though not at all in the "smoking gun" category, Maresca's somewhat gratuitous age reference in discussing (and rejecting) an applicant for a Center job is all of a piece with his obvious effort to prefer younger people in the circumstances of this case, as shown by his distortion of the basic nature of the Outstanding Scholar Program.

Maresca's behest—was placing the Programees (and those young Programees exclusively, to the exclusion of incumbents such as plaintiffs) on a promotional fast-track, Maresca made a wholly unnecessary reference to the age of a Department employee. John Hart ("Hart"), a military veteran with 27 years of government service, had applied for a computer specialist vacancy at Center. Maresca's memorandum recommending that Mr. Hart's application be disapproved starts out by mentioning that "Mr. Hart was born 7/29/32 ..." (P.Ex. 26). Duvall, who like Hart was 61 years old at the time, reacted to Maresca's reference to Hart's age by saying (Dep.72–73): "... the age ... didn't strike me as pertinent to the decision process....I'm almost that old, and I don't want to be discriminated against because of that, either." Even though this Court ordinarily views something of that nature as innocuous (and it so explained in the earlier-cited Appendix 2 to Opinion at 1275), in this instance Maresca appears to have confirmed—perhaps even unintentionally—the age-based mindset that this Court finds unquestionably marred the manner in which he caused the Program to be implemented at Center.

17. Programees hired during the summer of 1992 became the only contract specialists in Center's history to be placed on noncompetitive lines of progression from start (GS–7) to finish (GS–12). Magnuson Dep. 62, 64. Each Programee was under 40 years of age, and all but two of them were under 25 years of age, when hired in 1992: Jennifer Ahlberg (21), Patricia Benson (38), Brenda Flattum (24), Jill Hamilton (24), Michael Hill (22), Teresa Hussain (23), Roberta Schroeder (22), Mark Sojka (22), Kristal S. Stanley (23),

Scott K. Stanley (22), Amy Swinea (22) and Scarlett Tabor (30). Stip. ¶ 30.[6]

18. Program itself originated as part of the consent decree (P.Ex. 1) in a class action, *Luevano v. Campbell,* 93 F.R.D. 68 (D.D.C. 1981). It was one of several alternative measures devised to expand hiring opportunities within the federal government for certain "entry level job[s] at the GS–5 or GS–7 level." P.Ex. 3. While Program is a noncompetitive initial recruitment device, neither it nor any other policy or regulation of the federal government thereafter exempts or insulates Program recruits from the competitive process when seeking promotion or advancement. Tr. 62, 63. Nevertheless, on three consecutive anniversary dates following their initial appointments in the summer of 1992, Programees received promotions on a noncompetitive basis: from GS–7 to GS–9 in the summer of 1993, from GS–9 to GS–11 in the summer of 1994 and from GS–11 to GS–12 in the summer of 1995. P. Exs. 14B, 14E, 14H, 14J and 14K, P.Ex. 30 at ¶¶ 2C, 5B and 5C; Second Amended Ans. ¶¶ 13–14; Tr. 366–67.[7]

19. Incumbent contract specialists at Center, including plaintiffs, never received notice from Department that all Programees, whose original appointments were made on a noncompetitive basis, were also on noncompetitive career ladders from the very inception of their appointments. Tr. 28, 43–44, 261, 281. Yet Department's personnel regulations require notice in advance that anticipated promotions will be made on a career-ladder/noncompetitive basis, and the initial rung of the career ladder for which the career-ladder applicant is selected must be filled on a competitive basis (P.Ex. 13):

A career promotion is one without current competition when: (1) An employee was

---

6. In light of his further recommendation (which Center officials followed) that Program recruitment should take place at college placement offices, Maresca was not at all surprised that all but two Programees were recent graduates (Maresca Dep. 189). Indeed, Center officials followed Maresca's instructions to the letter, limiting their contacts to college placement offices, with no thought being given to other potential placement sources having generationally more diverse populations of high academic achievers (for example, honor societies such as Phi Beta Kappa) Tr. 150.

7. All five Programees who had left Department's employ by the time of trial (Stip.¶ 30) had received noncompetitive promotions through the anniversary dates preceding their respective voluntary terminations. And one of the five, Brenda Pierce (nee Flattum), was promoted despite a supervisory evaluation finding that "much more training is required" of Ms. Pierce before she could "operate independently." P.Ex. 19.

appointed, or selected through the use of competitive promotion procedures, for an assignment intended to prepare the person for the position being filled (career ladder).

\*   \*   \*   \*   \*   \*

Career-ladder promotions without current competition may be made only when the intent was a matter of record prior to the initial selection and all potential applicants were so informed. Career ladders must be documented and be available to employees. Career-ladder positions are those with known promotion potential; therefore, an announcement under competitive promotion procedures must inform possible applicants of the potential available to the selectee.

Although there are certain limited exceptions under which career-ladder promotions can be made without initial competition, personnel officer Magnuson confirmed that none of those exceptions covered Programees. Tr. 61–67; P.Ex. 13 at ¶ 12c(3) to (10).

20. When noncompetitive career-ladder promotions began to be awarded in the summer of 1993, the 12 Programees who benefited from that deviation from Department's career-ladder regulations were younger by half (with a mean age of 25) than plaintiffs, each of whom was already older than age 50: Lumpkin, 53; Blazek, 55; Brenner, 52; Bush, 59; Hawkins, 51; Varnell Owens, 54; Sedlak, 57. Stip. ¶¶ 17–23. While the noncompetitive promotions for Programees that Maresca caused to be put into place at Center then stimulated plaintiffs to action culminating with this lawsuit (Stip. ¶ 16; Duvall Dep. 49–50, 54, 57), the evidence shows that plaintiffs' attempts at advancement within the contract specialist ranks had been stymied ever since 1991, when the policy that

required Central Office's stamp of approval for all appointments and promotions in contract specialist jobs at Center took effect. That policy, which was Maresca's brain-child as well, was authored in September 1990 and remained in effect for approximately 3 years.[8] Although plaintiffs' proposed Findings 23 through 28 have dwelt on promotions other than those effected by the Program during that period, in an effort by plaintiffs to provide further support for their charge of age discrimination, this Court finds that those additional matters set out by plaintiffs do not themselves call for an inference that they were impermissibly motivated by age discrimination. Accordingly these Findings will not address those matters, which depend in material part on notions of disparate impact rather than disparate treatment.

21. After Darr became Center's Director in the summer of 1993, she learned of the resentment held by incumbent contract specialists, in particular those with "many years of experience," about the fact that only Programees (hired in 1992) were on a noncompetitive promotional career ladder. Darr described her response (Dep.51):[9]

> And I said well, why don't we make them all go to the same grades so that we can level the playing field here. And they [human resources personnel at Center] said that would really be the right thing to do. So based on their advice, I went ahead.... So that was the beginning.

While Darr testified on direct examination that the desk audits that she ordered began as early as the summer of 1993, so that she could not have been influenced by the statutory notice of intent to sue that was filed on plaintiffs' behalf on October 19, 1993

---

8. Maresca's testimony that Central Office relinquished promotional and hiring authority back to Center in February 1993 was discredited by his superior Duvall. While unsure of the exact date of the reversion, Duvall knew that it occurred after Mr. Crump's arrival at the Central Office in June 1993. Tr. 491–92. In light of the many other discrepancies in Maresca's testimony, and given Secretary's failure to produce the document that Maresca had allegedly reviewed (Tr. 438–39), this Court finds that Central Office's approval of promotions was required at least through the second quarter of 1993.

9. It is further confirmatory of this Court's determination that the Maresca-initiated discriminatory preference for the much younger Programees established a discriminatory pattern of promotions to note that when Darr—who later (in the late summer or fall of 1994) initiated the process that would place other contract specialists (not just Programees) on a career ladder—originally floated that suggestion past Center's human resources people, it was clear that they had never considered that idea. Darr Dep. 50–51.

(Amended Ans. ¶ 16), she corrected herself on cross-examination and acknowledged that the first desk audit was not performed until January 1994 by Carline Brochard ("Brochard") from Department's Iowa City facility. Tr. 391–92, 410–14; Darr Dep. 51–53. Darr also conceded that by the time that she communicated with Brochard, plaintiffs' attorney "had already written" to her, "so [she] paid attention to this." Tr. 414; Darr Dep. 52.

22. It is undisputed that each plaintiff possesses the qualifications and ability to perform the contract specialist positions to which she was assigned, and that plaintiffs also possess the abilities and qualifications to perform at higher GS levels. Stip. ¶ 25; Johnson Dep. 17; Magnuson Dep. 14, 58–59; see P.Ex. 17A–F "qualified but not selected" notices. After Programees started working at Center, plaintiff Hawkins, who was still working as a wholesale division purchasing agent (not a contract specialist), had to provide training to Programee Terri Betti ("Betti"). Yet by the time that Hawkins finally attained a GS–5 contract specialist position in November 1995, Betti, who was promoted noncompetitively to a higher grade level on each of her anniversary dates, was already a GS–12.[10]

23. In the fall of 1994 (more than 3–1/2 months after plaintiffs filed their original complaint on June 13, 1994) all plaintiffs except Brenner began to receive promotions. Lumpkin's notification of her promotion is illustrative. Lumpkin, who had been at the GS–7 (non-career-ladder) level since 1990, was summoned into Director Darr's office on January 17, 1995 and was told by Darr that she was being promoted to a GS–9 on a GS–9/11/12 career ladder. That career-ladder promotion to a GS–9 was not made in connection with any outstanding promotion announcement, nor was Lumpkin's promotion accompanied by a Department form notice (e.g., P.Ex. 17). As for Blazek, she had languished as a GS–11 for a decade until she was promoted to a GS–12 in October 1994. Likewise, Bush was classified as a GS–11 (non-career-ladder) from March 1989 until she was promoted to a GS–12 in February 1995, and Sedlak remained a GS–11 from 1987 until she was promoted to a GS–12 in October 1994. As noted earlier, Hawkins was first promoted to a contract specialist position at the GS–5 level on November 26, 1995, after years as a purchasing agent.

24. Secretary has offered no evidence that the promotions given to Programees (and thus rendered unavailable to plaintiffs) during the time frame when Programees were given the benefit of their age-discriminatory career-ladder promotion arrangement were awarded to the most qualified applicants regardless of age. On the contrary, the automatic granting of those promotions was limited to the youthful Programees (and to no one else) without any consideration of the comparative qualifications of all those eligible and qualified for such promotions. Nor has Secretary offered any evidence supporting any "business necessity" for the illegal alteration of the Program from a preferential hiring mechanism into a preferential promotional device. Tr. 113–14.

25. Secretary's proposed Findings and Conclusions have sought to distance Maresca from the decisionmaker position as to the matters relevant to this litigation. Those efforts are wholly unpersuasive, for the credible evidence shows (a) that Maresca's input effectively caused the establishment of the illegal age-discriminatory facet of the preference that was given to the Programees by adding the career-ladder element to their initial hiring and (b) that Maresca's directive (which was carried out) that recruitment for the Program should take place at area colleges created a bias toward the hiring, and hence toward the automatic promotion, of much younger people to the detriment of plaintiffs in violation of ADEA. And the credible evidence also supports the inference that Maresca had and acted upon the prohibited purpose described in Finding 5. This Court so finds. And because it was Maresca's age-biased input that caused the Program to be implemented in the age-discriminatory way

---

**10.** In addition to the highly satisfactory evaluations that Hawkins had received in her annual appraisals, she had also been the recipient of cash awards for her performance in 1991, 1993 and 1994. Tr. 305. Each of the other plaintiffs has also been rated fully and highly satisfactory in her annual reviews.

that it was, the further facts (c) that Magnuson rather than Maresca might arguably be viewed as having been the ultimate decisionmaker in the technical sense and (d) that nothing evidences any age-discriminatory intent on *Magnuson*'s part are entirely irrelevant.

### Conclusions of Law

1. This Court's jurisdiction over this action under ADEA § 633a(c)[11] is not disputed. This Court concludes that it has such subject matter jurisdiction.

### Disparate Treatment

2. Age discrimination of the disparate treatment variety may be proved by either of two methods (see, e.g., *Kralman v. Illinois Dep't of Veterans' Affairs*, 23 F.3d 150, 153 (7th Cir.1994))[12] By the so-called direct method a plaintiff presents direct or circumstantial evidence that age was the determining factor. *Troupe v. May Dep't Stores Co.* 20 F.3d 734, 736 (7th Cir.1994) (citations omitted) explained the "[d]ifferent kinds and combinations of [circumstantial] evidence"—something other than an outright "acknowledgement of discriminatory intent"—that can raise the inference of intentional discrimination under the direct evidence route:

> The first consists of suspicious timing, ambiguous statements ... and other bits and pieces from which an inference of discriminatory intent might be drawn.... Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic ... on which an employer is forbidden to base a difference in treatment received systematically better treatment. And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination. Each type of evidence is sufficient by itself ... to support a judgment for the plaintiff; or they can be used together.

This action fits squarely within each of the *Troupe*-described categories, even though *Troupe* teaches that any one would suffice to support judgment for plaintiffs.

3. As for the first *Troupe* category:

(a) It was naturally to be expected that a limitation on the recruitment of Programees to Chicago area colleges exclusively would (as it did) cause the candidate pool to consist largely of recent graduates in their early to mid-twenties (Maresca Dep. 189; Johnson Dep. 9).[13]

(b) Maresca was totally incredible in his denial of the vital (and really determinative) role that he played in directing Center's management personnel to seek out Program recruits at those colleges, to hire them *and* to place those recruits on noncompetitive GS–7 to GS–12 career ladders.[14]

11. Citations to ADEA will take the form "ADEA § —," referring to the section numbering within Title 29 and not to ADEA's internal numbering.

12. In either event, ADEA plaintiffs need not prove that age was the sole factor in the challenged employment decision. Instead "[t]he ultimate issue at trial is whether 'age was a *determining factor*' in the employer's decision" (*EEOC v. Century Broadcasting Corp.*, 957 F.2d 1446, 1450 (7th Cir.1992), quoting *Brown v. M & M/Mars*, 883 F.2d 505, 507 (7th Cir.1989) but adding emphasis)

13. In 1992 the average age of the Programees was 25, compared to plaintiffs' average age of 54 (Finding 20). In the late 1950s and early 1960s, when plaintiffs had been of "college age" (in their early to mid–20s), less than 7% of all females were college graduates (1959: 6%; 1964:

6.8%), compared to an 18.6% college graduation rate for females in 1992. For both sexes the graduation rate in 1964 was 9.1%, and it had more than doubled to 21.4% in 1992. U.S. Bureau of the Census, Current Population Reports, Series P20–476, "Educational Attainment in the U.S. March 1993 and 1992," table 18. Such Census Bureau educational attainment figures are the type of data that may be judicially noticed.

14. Maresca took exception to the statement that as chief of personnel at Central Office he had "authority over all personnel programs and operations at the NAC." But that description of Maresca's authority is contained in the parties' Stipulations, which are binding on the parties, and Maresca's rejection of that statement serves to undermine his credibility. Darr also confirmed that Maresca "had authority over all per-

(c) Unlike his subordinates at Center, who were generally unfamiliar with the Program until he brought it to their attention during his spring 1992 visit to the Center (Palmer Dep. 9, Cooper Dep. 17), Maresca knew full well that the Program could be used only to fill entry-level positions (GS–5/7). By the very terms of the Program Maresca could not honestly believe that it also sanctioned the concurrent placement of Programees into GS–7/9/11/12 noncompetitive career ladders (see Prusinski Dep. 10–12, 61; P. Exs. 2 and 3; Stip. ¶¶ 5, 7).

(d) Without exception, the management team at Center with whom Maresca visited in the spring of 1992 named him as the person whose directions they followed in putting Programees on noncompetitive career ladders (Magnuson Dep. 36, 65; Cooper Dep. 33, 46, 67–68, 75; Johnson Dep. 21–22, 40: Palmer Dep. 19, 55).

(e) Although Maresca apparently suggested in his spring 1992 visit that a study be undertaken "to determine whether or not career ladder positions (GS 5–12) would be supportable" at Center (P.Ex. 6 ¶ 7), when it came to Programees Maresca ordered their placement onto noncompetitive career ladders without benefit of any such study. Furthermore, once Programees were on board in the summer of 1992, Maresca neither followed up on nor showed any later interest in whether any progress was being made on that study (Cooper Dep. 73; Magnuson Dep. 38).[15]

(f) Maresca's purported "reply" to Duvall's September 4, 1992 e-mail message (P.Ex. 29) must be considered a fabrication by Maresca (see Finding 14). In all probability Maresca prepared that "reply" only after he learned that plaintiffs had filed this action claiming age discrimination via the promotional preferences afforded to Programees—a program authored by Maresca. But regardless of its date of preparation, there is no truth to the statements in that "reply," nor is there any truth to Maresca's testimony that Darr first alerted him in 1994 that Programees had been on noncompetitlve GS–7/9/11/12 career ladders since they were hired in 1992.

(g) All of Maresca's already-described actions consistently reflected an attempt to divorce himself from a scheme of his own making—a scheme that involved the erection of barriers designed to thwart the promotional opportunities of plaintiffs, the oldest group of Center's contract specialists. That scheme caused plaintiffs to lose out, by reason of the automatic progression granted to the much younger Programees, on the opportunity for promotions to contract specialist jobs that their Center managers routinely found plaintiffs qualified to hold (see Finding 22).

(h) Finding 16 reflects an additional incident involving Maresca that Duvall, who had contact with him on a day-to-day basis and officed just around the corner from him, considered dubious. Although this Court would ordinarily consider Maresca's gratuitous reference to Hart's age (61)—which was made in the course of disapproving Hart's application for a position at Center—as innocuous, the fact remains that it was made at a time contemporaneous with Maresca's instruction to Center's management that Programees be placed on career ladders. As such, it is wholly consistent with the already-discussed evidence that strongly implies age-based bias on Maresca's part.

sonnel programs at the NAC" (Tr. 368). And even if the Stipulation were arguably to be read more narrowly as to Maresca's actual direct-line authority to make the relevant decisions, what has been said in Finding 25 still causes his age-discriminatory motivation to be fatal to Secretary here.

15. Maresca's suggestion of a study on the feasibility of placing incumbent contract specialists on GS–7 to GS–12 career ladders must be viewed skeptically and as most likely pretextual, given his claim that Center's incumbents were lacking in skills and were the source of complaints. Center's managers' testimony indicated that Maresca's accusations about those incumbents were a figment of his imagination (Magnuson Dep. 14; Johnson Dep. 17; Palmer Dep. 85; Cooper Dep. 92–93; see Stip. ¶ 25). Both the fact that Maresca made the suggestion of a career ladder study so perfunctorily and the fact that it never materialized further confirm that it represented nothing but a cover story to conceal the age-based discriminatory action on his part.

4. *Troupe*'s second predicate for drawing an inference of intentional discrimination under the direct evidence route is in terms of "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic [here, age] on which an employer is forbidden to base a difference in treatment received systematically better treatment" (*Troupe*, 20 F.3d at 736). When the 12 Program recruits were hired in contract specialist jobs and were simultaneously placed on GS–7 to GS–12 noncompetitive career ladders, those substantially younger employees (hired under the Program) received systematically better treatment than plaintiffs (who were their seniors in age and were ADEA-protected), because the Program recruits were the only group of contract specialists who were favored with that promotional preference. And analysis of the circumstances readily confirms that they were "similarly situated to plaintiff[s] other than in the characteristic" of age. As already discussed, Programees' possession of college degrees did not place them in a situation dissimilar to that of the older incumbents (plaintiffs), because neither a college degree nor academic excellence in attaining one is a valid criterion for obtaining contract specialist *promotions* (Stip.¶¶ 5–7). And although Programees were placed on a promotional fast-track—allowing them to rise from an entry level GS–7 to a GS–12 all in the span of three years—without their first having had to demonstrate *any* ability to perform the job itself, the breadth of activities that a contract specialist is authorized to perform is a function of the employee's underlying warrant authority (Finding 2; P.Ex. 21A). If anything, the status of Blazek, Bush and Sedlak (whose job performance had qualified them for "unlimited" contracting authority since the late 1980s) and of Lumpkin (whose job performance had qualified her for $1 million in warrant authority), all of whom were relegated to non-career ladder jobs while Programees (who had only basic warrant authority to begin with) progressed up that ladder

every year,[16] reinforces the inference of intentional discrimination identified in *Troupe*.

5. As for the third *Troupe*-identified basis for drawing an inference of discriminatory intent, the same factors that demonstrate Maresca's bogus rationalizations for the favoritism that was extended to Programees (see Conclusion 3) also confirm that those stated reasons are "unworthy of belief, a mere pretext for discrimination." And it has already been explained that so far as is relevant here, it is Maresca's age-discriminatory motives that must be ascribed to Secretary.

6. As an alternative to the so-called "direct method" dealt with in Conclusions 2 through 5, a plaintiff in an ADEA action can utilize the familiar "indirect" burden-shifting method of proof set out in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and summarized in *Kralman*, 23 F.3d at 153 (footnote omitted):

> Under this latter method, the plaintiff must establish a *prima facie* case of discrimination by proving, *inter alia*, that he or she was in the protected class and was otherwise qualified for the position. Satisfaction of these requirements for a *prima facie* case establishes a rebuttable presumption of discrimination and shifts the burden of production to the defendant to articulate lawful reasons for the employment decision. Once the defendant articulates a legitimate, nondiscriminatory reason for its action, the presumption of discrimination dissolves and the burden shifts back to the plaintiff to prove that the defendant's proffered reasons are pretextual.

As already suggested in earlier Conclusions (particularly Conclusion 5), plaintiffs would prevail under that method as well, a matter elaborated on in the following Conclusions.

7. As *Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1472–73 (7th Cir.1993) explains *McDonnell Douglas'* first (prima facie) step in the context of promotions:

> With respect to the failure to promote, a plaintiff must prove by a preponderance of

**16.** Even a Programee whose proficiency was questioned, Brenda Pierce, was promoted auto-

matically (see Finding 18 n. 7).

the evidence that the plaintiff is a member of a protected group, that the plaintiff applied for the position sought, that the defendant rejected the plaintiff for the position, and that the defendant granted that promotion to a person whose [age was younger than] that of the plaintiff[ ] but whose qualifications were similar [to] or less than those of the plaintiff.

Obviously the "specifics" of the burden-shifting formula "will inevitably vary and are dependent upon the type and circumstances of employment action under attack" (*Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 523 (7th Cir.1994)). Here plaintiffs could not of course apply for the selfsame jobs that Programees were awarded, because Secretary did not announce those promotions but rather reserved them exclusively for Programees. Instead plaintiffs have satisfied their prima facie case by demonstrating that they applied for those types of promotions when Secretary did open them up for bids—as *Loyd*, 25 F.3d at 523 (citations omitted) teaches:

> For instance, where an employer ordinarily entertains applications for a certain type of job but a plaintiff is deterred from applying by the very discriminatory practices he is protesting yet can show that he would have applied had it not been for those practices, a sufficient preliminary link between discrimination and adverse consequences is established.

> So too (indeed more so) where an Employer does not solicit and await applications but hands out promotions on its own initiative in a nonselective, serial fashion. If the plaintiff alleges that the employer's decision not to approach people of her status was itself illegitimately motivated and shows that but for such a practice she likely would have been approached, then all she must do to complete the chain of causation that would permit an initial inference of discriminatory treatment actually affecting her job situation is establish that, had the employer approached her, she would have accepted the offered position.

8. "After a trial on the merits, however, the question of whether [a plaintiff] adequately made out the elements of a *prima facie* case fall[s] away, and the operative issue is simply whether, viewing the evidence in its totality, [plaintiff] sufficiently proved that age was a determining factor ..." (*Hybert v. Hearst Corp.*, 900 F.2d 1050, 1054 (7th Cir.1990)). Nevertheless the *McDonnell Douglas* analysis still has a role to play in the trial setting, because plaintiffs can ask the trier of fact "to infer discrimination from the defendant's failure to present a credible explanation" for excluding plaintiffs from career ladder promotional opportunities that were conferred exclusively on Programees beginning in 1993 (*EEOC v. G–K–G, Inc.*, 39 F.3d 740, 747 (7th Cir.1994); see also *Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir.1994) (emphasis in original) ("If the plaintiff shows that the reason given is not *true*, then he has shown pretext," and "the trier of fact is allowed to infer that the falsehood was meant to conceal illegal job discrimination")).

9. This Court is of course aware that "[i]n trying to establish that an employer's explanation is pretextual, an employee must 'focus on the specific reasons advanced by the defendant'" (*Hughes v. Brown*, 20 F.3d 745, 747 (7th Cir.1994)). In advance of trial Secretary proffered this as his claimed justification for Department's linkage of the career-ladder promotional arrangement as exclusively benefiting the Programees and *not* plaintiffs (Secretary's Proposed Conclusion 95, part of the February 12, 1996 Final Pretrial Order submitted by the litigants and approved by this Court)

> 95. Furthermore, the VA has articulated a legitimate, nondiscriminatory reason for its promotional policies, namely, that it sought to improve the educational level of its contract specialist workforce.

That of course was plainly a nonanswer—one that should clearly be viewed as pretextual—because that stated goal (which is certainly a permissible one, although a college degree was not a job requirement as such) was served by he Program alone, without engrafting onto it the age-discriminatory com-

ponent about which plaintiffs properly complain in this action.[17]

10. After the trial Secretary (perhaps recognizing what has been said in Conclusion 9) shifted ground substantially. Here is the explanation that he proffers in his post-trial Proposed Conclusion of Law 139:

139. Third, the VA has articulated a legitimate, nondiscriminatory reason for its use of the OSP and of the career ladder policy, namely, that:

(a) the OSP was used in 1992 to improve the skill-level of the workforce and to provide an outside source of recruitment (Maresca 442; Def. Exs. # D8, # D9, # D21, # D32), as well as because the OSP was a hiring authority that enabled VA managers to fill vacancies faster than through the merit promotion plan (Magnuson Tr. 64, 89, 95, 110–112, 118–119);

(b) placing the OSP recruits on a GS–7/9/11/12 career enabled NAC managers to fill the many unfilled vacancies without having to go through the more time-consuming merit promotion plan, and could make the position more attractive to outside applicants (Maresca Tr. 429; Magnuson Tr. 64, 110–112, 118–119);

(c) after competition [sic—should be completion] of a study, the incumbent contract specialists of all ages were to be put on the same GS–12 career track because it made sense to eliminate the constant recruiting for the vacancies that were continually coming up (Magnuson Tr. 68, 72, 121, 130, 144–145);

(d) although this goal was delayed, a study was completed in 1994 which resulted in numerous incumbent contract specialists of all ages being promoted to the GS–12 level as determined by the study, and the establishment of a GS–9/11/12 career ladder for experienced contract specialists of all ages (Darr Tr. 391–392, 405–406).

Those assertions simply do not withstand scrutiny:

(a') Proposed Conclusion 139(a) is subject to the same flaw that was just identified in this Court's Conclusion 9. That stated reason justifies adoption of the Program alone, but it provides no support for the Program-linked and age-discriminatory action that has been challenged and is at issue here.

(b') Proposed Conclusion 139(b) really expresses a post-hoc rationalization: If those were really Secretary's reasons, why were they wholly missing from the FPTO, which was prepared not only after Secretary's unsuccessful summary judgment motion but also after discovery was completed and after Secretary knew everything that his people were saying. Those several factors render the current characterization suspect, but taking all of the previously-described testimony into account in any event, this Court concludes that the now-stated reasons are pretextual in terms of what Maresca was really after.

(c') Proposed Conclusion 139(c) is belied by the facts regarding the claimed "study" in terms of the involvement of *Maresca* (see Conclusion 3(e) and n. 8), who was the person who engineered the adoption of the tainted Program. As for the cited Magnuson testimony, here too we have a post-hoc rationalization that is also pretextual.

(d') This after-the-fact rationalization is particularly bogus. It will be remembered that it was Darr who initiated the process that placed other contract specialists such as plaintiffs on a career ladder, and when she made that suggestion it was an idea that no one had even thought of (Finding 21 and n. 9). To suggest that idea as somehow supporting the validity of Maresca's earlier age-discriminatory proposal—the one that was implemented at his instance—is bogus.

11. In sum, Secretary's explanations for extending the career-ladder promotional opportunities to the much younger group of Programees, and not to provide comparable opportunities to the older incumbent plaintiffs, are not credible. They fail the pretext test. And that too independently supports plaintiffs' claim—as *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742,

---

**17.** Plaintiffs have not challenged the inauguration of the Program *as such*, when serving (as it was designed to serve) as an entry-level recruiting measure.

2749–50, 125 L.Ed.2d 407 (1993) (footnote and citation omitted) teaches:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is *required*," 970 F.2d, at 493 (emphasis added).

This Court as the trier of fact *has* inferred that ultimate fact based on the record here.

### Disparate Impact

12. Opinion at 1270–71 parsed the then-decided cases in light of the relevant ADEA statutory provision (ADEA § 633(a)) and concluded that it was a fair assumption "that as to federal employees the courts (including our Court of Appeals) would still recognize a disparate impact theory under Section 633(a)" (Opinion at 1271). No case law developments since the Opinion have cast further light on that issue, and these Conclusions will accordingly continue on that premise. It should be emphasized, however, that a pro-plaintiff determination on that score is *not* necessary to allow plaintiffs to prevail here, for they have already done so in terms of disparate treatment.

13. As described in *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977), a disparate impact claim may be established by the proof of "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another

and cannot be justified by business necessity." Similarly, *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) (speaking of Title VII, but stating a principle that would also apply to ADEA claims by federal employees under the analysis referred to in Conclusion 12) had earlier said:

> The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity.

14. In this instance, even if an assumption were to be made in a manner most favorable to Secretary—that career-ladder promotions (rather than promotions on a competitive basis) represent an employment practice that is facially neutral [18]—that practice fell far more harshly on plaintiffs than on the far younger, non-ADEA-protected group of Programees. It was not until after the Programees were already on board with career-ladder promotion rights in place that Center changed its practice to make career-ladder opportunities available to incumbents such as plaintiffs. And by then 100% of the positions at issue (the 12 career-track noncompetitive GS–7/9/11/12 jobs that had gone to Programees) were held by a group all of whom were under 40 and whose average age was 24, while the relevant labor market of contract specialists (those at Center who held GS 7 to GS 11 jobs) who were age 40 and older formed a significant component of the qualified labor pool,[19] the adverse impact of the challenged employment practice (the noncompetitive promotional career ladders into which only Programees were placed in 1992) is evident. Indeed, in this situation the observed number of members of the protected group (age 40+) who benefited from the challenged employment practice (the noncompetitive promotional opportunities in the

---

18. That assumption is of course overly generous to Secretary: As has been stressed repeatedly here, plaintiffs' grievance targets not that practice alone but its linkage with the Program, a combination that is totally unneutral in its application vis-a-vis plaintiffs. But as the ensuing discussion reflects, that is equivalent to showing Secretary's liability under a disparate impact analysis as well as on a disparate treatment basis.

19. Plaintiffs, all of whom are over 50 years of age, had an average age of 53.4 in 1992, or 29 years older than the Program recruits. And even among the 40+ crowd, plaintiffs at ages 50+ would be in a protected class vis-a-vis younger members of the over–40 set.

1992 time frame) is the "inexorable zero" (*International Bhd. of Teamsters*, 431 U.S. at 342 n. 23, 97 S.Ct. at 1858; and see *Johnson v. Transportation Agency, Santa Clara County*, 480 U.S. 616, 636, 107 S.Ct. 1442, 1454, 94 L.Ed.2d 615 (1987)).

15. Conclusion 13 has already reflected that an employer's demonstration that a challenged practice was utilized because of "business necessity" can defeat a disparate impact claim. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 659, 109 S.Ct. 2115, 2126, 104 L.Ed.2d 733 (1989) puts it in these terms:

> [I]t is generally well established that at the justification stage of such a disparate-impact case, the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer.

But the selfsame factors that have shown the pretextual nature of Secretary's proffered explanations also serve to defeat any such defense—hence Finding 24's determination that Secretary has established no business necessity for the challenged action. And hence plaintiffs must prevail from the alternate perspective of disparate impact as well.

*Award of Judgment*

16. In light of the prior Conclusions that plaintiffs have proved Secretary's violations under ADEA § 633a under both disparate treatment and disparate impact theories (either of which suffices to compel judgment in plaintiffs' favor), plaintiffs are entitled to "such legal and equitable relief as will effectuate the purposes of this chapter" (ADEA § 633a(c)). That calls for a make-whole remedy that places plaintiffs on the type of career ladder that Programees began to benefit from in the summer of 1993, and that advanced Programees to GS–12 positions by the summer of 1995. Indeed, the fact that most plaintiffs were placed on career ladders shortly after this action was brought amply demonstrates that it would have been feasible to have done so earlier. Accordingly it is ordered that each plaintiff shall receive the economic equivalent of a promotion retroactive to July 1, 1993 in a manner that will provide her the benefit of a career ladder promotional track as of that date:

(a) Lumpkin will be on a career ladder at the GS–9 step 3 level as of July 1, 1993, with annual promotions thereafter through the GS–12 step 1 level effective as of July 1, 1995, and her back pay shall be in accordance with the calculations set forth in P.Ex. 38.

(b) Blazek will be on a career ladder at the GS–12 step 2 level as of July 1, 1993, with annual step increases thereafter through the GS–12 step 4 level effective as of July 1, 1995, and her back pay shall be in accordance with the calculations set forth in P.Ex. 40.

(c) Brenner will be on a career ladder at the GS–7 step 1 level as of July 1, 1993, with annual promotions thereafter through the GS–11 step 1 level effective as of July 1, 1995, and her back pay shall be in accordance with the calculations set forth in P.Ex. 43.

(d) Bush will be on a career ladder at the GS–12 step 2 level as of July 1, 1993, with annual step increases thereafter through the GS–12 step 3 level effective as of July 1, 1995, and her back pay shall be in accordance with the calculations set forth in P.Ex. 41.

(e) Hawkins will be on a career ladder at the GS–7 step 6 level as of July 1, 1993, with annual step increases thereafter through the GS–11 step 1 level effective as of July 1, 1995, and her back pay shall be in accordance with the calculations set forth in P.Ex. 42.

(f) Sedlak will be on a career ladder at the GS–12 step 2 level as of July 1, 1993, with annual step increases thereafter through the GS–12 step 4 level effective as of July 1, 1995, and her back pay shall be in accordance with the calculations set forth in P.Ex. 39.

This action is set for a status hearing at 9:30 a.m. April 28, 1997, with plaintiffs' counsel being directed to provide both this Court and defense counsel on or before April 25 with their calculations of the total amount to be awarded to each plaintiff—so that if at all possible a judgment order may be entered on April 28.

17. As prevailing parties, plaintiffs contend that they are also entitled to recover attorneys' fees under ADEA § 626(b) (citing *Heiar v. Crawford County,* 746 F.2d 1190, 1203 (7th Cir.1984)). If that were the case, plaintiffs would be deemed "prevailing" parties not only as to the claims adjudicated here but also for the limited corrective steps that Secretary has taken (a) through the promotions of Lumpkin, Blazek, Bush and Sedlak and (b) through the full remedial measures provided to plaintiff Owens after this action was brought (her promotion with back pay) (see *Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 2574–75, 65 L.Ed.2d 653 (1980)).

18. Plaintiffs' contention as to an award of attorneys' fees is at odds, however, with the fact that it is not ADEA § 626(b) but ADEA § 633(a) that deals with federal employees' age discrimination claims. Our Court of Appeals has not addressed the issue. Although a few District Court cases have allowed such fees in the context of federal employees, the appellate case law elsewhere has consistently emphasized the United States' sovereign immunity and has therefore *rejected* such awards (see the most recent extended discussion in *Nowd v. Rubin,* 76 F.3d 25, 26–28 (1st Cir.1996) and the earlier decisions in *Lewis v. Federal Prison Indus., Inc.,* 953 F.2d 1277, 1281–82, *Palmer v. General Servs. Admin.,* 787 F.2d 300, 30D–02 (8th Cir.1986) (as to administrative proceedings, not judicial proceedings); *Kennedy v. Whitehurst,* 690 F.2d 951, 966 (D.C.Cir.1982) (same)).[20] This Court will follow those cases, and it therefore denies plaintiffs' motion as grounded in ADEA itself.

19. Plaintiffs also urge that attorneys' fees are properly awardable under the Equal Access to Justice Act, 28 U.S.C. § 2412(b). *Nowd,* 76 F.3d at 28 agrees as to that potential source of recovery. But in this instance neither side has spoken to the manner in which this case does or does not fit the

conditions prescribed for recovery under EAJA. Accordingly the parties are ordered to make simultaneous submissions in that respect on or before May 6, 1997. As taught by *Budinich v. Becton Dickinson & Co.,* 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988), the pendency of that issue does not detract from the finality of the judgment to be entered on the merits in plaintiffs' favor.

---

**20.** Plaintiffs' proposed Conclusion 24 cites to Judge Heaney's dissent in *Palmer,* 787 F.2d at 302–03, where he pointed to a presumptive entitlement to fees in judicial proceedings as the predicate for urging a like entitlement at the administrative level. Plaintiffs have not referred, however, to the adverse on-point decisions in *Lewis* and *Nowd.* As for Secretary, his proposed Findings and Conclusions understandably did not initially address the issue at all, for Secretary then operated on the premise that he would win on the merits. But Secretary's response to plaintiffs' original submission did not speak to the matter either.